No. 35,156

C. H. Cochran, *Petitioner,* v. Milton F. Amrine, Warden of the Kansas State Penitentiary, *Respondent.*

(130 P. 2d 605)

Opinion filed November 7, 1942.

*C. W. Brenneisen, Jr.,* of Kansas City, was on the briefs for the petitioner. *Charles H. Cochran,* pro se.

*Jay S. Parker,* attorney general, *Shelley Graybill,* assistant attorney general, and *Jay Kyle,* special assistant attorney general, were on the briefs for the respondent.

The opinion of the court was delivered by

Harvey, J.: This is a habeas corpus proceeding in which, after a hearing, the court denied the writ (153 Kan. 777). The United States supreme court granted certiorari and after a hearing accepted this court's conclusion that the record showing Cochran was represented by counsel throughout, and revealing on its face no irregularities in the trial, is sufficient refutation of petitioner's unsupported charge that he was denied the right to summon witnesses and testify for himself; but found in the petition for the writ allegations which had not been passed upon by this court that prison officials had frustrated Cochran's efforts to perfect an appeal within the time allowed by statute, and remanded the cause for further proceedings. (62 S. Ct. 1068.) Whereupon this court made the following order:

"Upon the consideration of the opinion of the United States supreme court in the above cause, handed down May 11, 1942, and the mandate which reached this court on June 15, 1942, wherein the decision of this court, reported in 153 Kan. 777, was reversed for further proceedings, it is held the only question to be considered on such further proceedings is the determination of whether the prison officials frustrated the petitioner's efforts to perfect an appeal of his case within the time allowed by law then in force for appeal of criminal actions, which was two years from the date of his sentence, May 23, 1933.

"And upon the request of the petitioner, C. W. Brenneisen, Jr., an attorney of Kansas City, Kan., is hereby appointed as attorney for the petitioner to represent him in the further proceedings before the court.

"The testimony, depositions, or other evidence on the issue as above stated will be heard by W. W. Harvey, a justice of this court, at a room in the state penitentiary at Lansing, Kan., designated by the warden for that purpose, on Wednesday, July 15, 1942, at 10:30 o'clock a. m. Counsel for petitioner and respondent are requested to advise the court or Justice Harvey at as early a date as possible the names of witnesses for whom they, wish the court to issue subpoenas. Justice Harvey has full authority to issue subpoenas and, in the interest of justice, to change the time or place of hearing, or to adjourn the hearing from time to time.

"By order of the court, June 15, 1942."

A hearing was conducted in conformity with this order at which the petitioner testified in his own behalf and presented two witnesses —Lacey Simpson, formerly warden of the penitentiary, and Mrs. Emma Hinton, a welfare worker who had frequently visited the penitentiary, and introduced certain exhibits; the respondent introduced the deposition of E. M. Stubblefield, a former deputy warden of the penitentiary, and certain exhibits, all of which will be referred to herein. At the close of the evidence the request of the petitioner's counsel to file a brief, in typewritten form, was granted. The brief on behalf of petitioner was filed September 22, that of respondent October 9, and petitioner's *pro se* reply brief October 19, 1942, and the cause has been submitted to the court upon the pleadings, evidence and briefs of counsel. While the testimony was heard by one of the justices of the court, the competency of the evidence and the weight to be given to the testimony and the various exhibits have been considered and passed upon by the court.

We first note the pertinent provisions of our law. Our constitution guarantees to one charged with crime a prompt, fair trial by jury. (Bill of Rights, §§ 5, 10, 18.) It does not guarantee to him an appeal to the supreme court. Our constitution fixes the jurisdiction of the supreme court as follows:

"The supreme court shall have original jurisdiction in proceedings in quo warranto, mandamus, and habeas corpus; and such appellate jurisdiction as may be provided by law . . ." (Const. art. 3, § 3.)

In *Union Pac. Rld. Co. v. Missouri Pac. Rld. Co.*, 135 Kan. 450, 452, 10 P. 2d 893, it was said:

"The legislature has the power to grant, limit and withdraw the appellate jurisdiction of this court and to provide a procedure for the exercise of the jurisdiction granted. The litigant has no vested right in an appeal which may not be abolished by the legislature." (Citing many cases.)

Our pertinent statutes respecting the appeal of criminal cases in

force at the time the petitioner in this case was sentenced read as follows:

"An appeal to the supreme court may be taken by the defendant as a matter of right from any judgment against him; and upon the appeal any decision of the court or intermediate order made in the progress of the case may be reviewed." (G. S. 1935, 62-1701.)

"The provisions of law relating to the manner of taking and perfecting appeals to the supreme court in civil cases . . . shall be applicable and extend to criminal cases . . ." (G. S. 1935, 62-1702.)

"The appeal must be taken within two years after the judgment is rendered." (G. S. 1935, 62-1704.)

The pertinent portion of the section relating to perfecting appeals in civil cases (referred to in 62-1702) reads as follows:

"Appeals to the supreme court shall be taken by notice filed with the clerk of the trial court, stating that the party filing the same appeals from the judgment. . . . A copy of such notice must be personally served on all adverse parties . . . or their attorneys of record . . ." (G. S. 1935, 60-3306.)

In criminal cases this statute has been construed to mean that the notice of appeal shall be served on the county attorney, if the action in the trial court was prosecuted by the county attorney.

Under the statutes above referred to the appeal is complete when the notice of appeal is served upon the opposing party or his attorney of record and filed with the clerk of the trial court. (*Schmuck v. Railway Co.*, 85 Kan. 447, 116 Pac. 818; *State v. Stout*, 113 Kan. 563, 215 Pac. 693.) Nothing is accomplished by filing the notice of appeal with the clerk of the trial court unless there is service on the adverse party or his attorney of record. Neither is the service upon the adverse party or his attorney of any consequence unless proof of that, together with the notice of appeal, is filed with the clerk of the trial court. With variations, which need not be noted here, that has been the practice throughout the history of this state. We cite only a few of a great many cases which might be cited as bearing upon this point: *Carr v. State*, 1 Kan. 331; *State v. King*, 1 Kan. 466; *State v. Ashmore*, 19 Kan. 544; *McLean v. State*, 28 Kan. 372; *White v. Central Mutual Ins. Co.*, 149 Kan. 610, 88 P. 2d 1041; *Protzman v. Palmer*, 155 Kan. 240, 124 P. 2d 455; *Dean v. Amrine*, 155 Kan. 513, 126 P. 2d 213.

When the notice of appeal and proof of service on the opposing party or his attorney of record are filed in the trial court it is the duty of the clerk of that court to forward copies of those documents and of the journal entry of the judgment appealed from to the clerk

of the supreme court, who receives and dockets such papers. (G. S. 1935, 60-3307.) Obviously it accomplishes nothing for a litigant or his counsel to file something directly in the supreme court.

We take note of the fact that the time for appeal in criminal cases and the procedure therefor were changed by a statute (Laws 1937, ch. 274, § 3; G. S. 1941 Supp. 62-1724), effective July 1, 1937, but this later statute has no bearing in this proceeding, for the petitioner's time to appeal had expired before it was enacted.

The record before us discloses that the petitioner was tried in the district court of Sumner county upon an information which charged him in the first count with the forgery of a described check and in a second count with the uttering of the check in Sumner county; that he was represented both at his preliminary examination and during the trial in district court by Harry B. Davis, of Anthony, an attorney whom he, or someone in his behalf, had employed. The trial resulted in a verdict of not guilty on the first count, and of guilty on the second count, of the information. A motion for a new trial and a motion in arrest of judgment were filed. These were considered by the court and denied May 29, and on that date sentence was imposed. Upon a showing that defendant previously had been twice convicted of felony, once in Oklahoma in 1920 and again in Sumner county in 1928, the court sentenced defendant to life imprisonment, as authorized by G. S. 1935, 21-107a.

At the hearing on July 15, 1942, the petitioner testified that directly after the verdict was returned against him he asked his attorney to appeal the case, but the attorney refused because petitioner did not have money to pay him. This incident is no reflection upon the officials of the state penitentiary.

The petitioner further testified that under the sentence just mentioned he was received at the penitentiary the night of May 31, 1933; that on June 4 or 5, 1933, he prepared, by writing in longhand, three copies of notice of appeal addressed to the Sumner district court at Wellington, Kan., and to the clerk of that court, and "asked the captain's office to mail it to the district court. . . . That is the usual way to get extra letters mailed," and the captain's office, Mr. Graham, said "they could not be mailed." These papers were not offered in evidence, and there is nothing further to show what became of them. It may well be that the refusal to permit them to be mailed was because they were "extra mail" under the prison rules. There is no contention on the part of the petitioner that he

was refused permission to send letters to the clerk of the district court of Sumner county at a time when prisoners were permitted under the rules to send out mail. The record also discloses that the petitioner wrote the clerk of the district court at Wellington, Kan., on October 4 and November 10, 1934, and on January 3, 1935; hence the prison authorities did not prevent him from writing to the clerk of the court in which he was tried within the time when he might have appealed his case. There is nothing in the evidence to indicate the contents of the letters written by the petitioner to the clerk of the district court. There is no contention on his part that they contained notices of appeal. The petitioner testified that he did not write any letters to the county attorney of Sumner county, John A. Potucek, but on cross-examination identified a letter written by him to Mr. Potucek on December 17, 1933, which reads:

"Will you consider any err which you have made. I believe you will if you could be shown that I'm innocent. I now can produce the man who wrote and gave check to my driver. I can produce evidence that he is guilty and you can get his testimony. I trust you will do the right thing in this matter. The man who did this is here, and if you will furnish warrant and leave blank I sign. Give same Sheriff Harris and have him see me when here.

"I swear Mr. Potusic, that I'm innocent and I will prove by this confession. I could not while there and please give me this opportunity to do so. Will you please make reply."

Clearly this could not be construed into a notice of appeal served upon the county attorney as required by statute for an appeal. It appears to have been the only letter he wrote to the county attorney within two years after his sentence. He did write the county attorney again on February 21, 1937, soliciting the aid of the county attorney in an effort on his behalf to get executive clemency. The petitioner testified that he had written one or two letters to his attorney, Mr. Davis, but on cross-examination identified eight letters he had written Mr. Davis within the two years after his conviction, the earliest being dated August 14, 1933, and the last March 5, 1935. The principal theme of these letters was the effort of the petitioner to have his attorney get him a new trial and a change of venue because of new evidence, which consisted almost entirely of his contention that an inmate of the penitentiary, whose real name was A. J. Messenger, but who was serving sentence under the name of Chas. Soudder, was the person who had forged the check and would make an affidavit to that effect, and petitioner sent his attorney a statement in the form of an affidavit which he said he had

written after conferring with Messenger and which the latter had signed. The record does not show that Mr. Davis undertook to get a new trial on that ground, perhaps in part for the reason that the petitioner was not found guilty of forging the check. Other reasons readily suggest themselves. In none of these letters did the petitioner say anything about having prepared or having attempted to file notices of appeal with the clerk of the district court, or notices upon the county attorney, or notices of appeal to anyone. In the first of these letters to Mr. Davis, after telling about the "new evidence" he had and asking his attorney to endeavor to get him a new trial because of it, he closed the letter thus:

"Trusting that . . . you will please consider the supreme court question and write me fully."

This indicates that he and his attorney had at some time talked about an appeal to the supreme court, but does not indicate that any definite steps for an appeal had been taken. In the letter of March 5, 1935, to his attorney he complained bitterly that the attorney had not furnished him with a certain affidavit he had requested, and also complained of the services given him by his attorney, and said:

"If I don't get a new trial, I'll go to the federal court on a writ. . . . because I mean to let the supreme court to decide it for me."

These two are the only references in all of these letters to any proceedings in court other than an effort to get a new trial and a change of venue so he could be tried before another judge and in another county. The above is all the evidence relating directly to any effort to get an appeal from the trial court to the supreme court. There was no contention in any of the letters that the prison authorities had frustrated his attempts to appeal his case.

It is argued on behalf of petitioner that the letters written to him by his attorney were confidential communications and should not have been received in evidence. There are at least two reasons why this contention cannot be sustained: *first*, most of those letters were introduced in evidence without objection; and *second*, in the brief for petitioner the two references above quoted are relied upon as tending to show that an appeal was contemplated and attempted.

Following the incident of June 4 or 5 above related, the petitioner testified that he prepared an appeal document to the supreme court with a brief and regular abstract. This was typewritten. That on the evening of June 9, 1933, his mother, an aunt and someone re-

lated to his mother whom the petitioner did not know, called at the institution about 5:30 or 6 o'clock in the afternoon; that Father Domain, a Catholic Father, took petitioner's mother to Mr. Graham, who brought her into the office to remain until the petitioner could be called from the cellhouse, when Graham took them into the visiting room. "We were sitting out there and I took an envelope with the appeal documents and handed them to my mother. Mr. Graham walked from behind the partition and took the papers away from my mother," and that Mr. Graham gave the papers back to petitioner about a week later. These papers were offered in evidence as petitioner's exhibit No. 1. Petitioner testified that the exhibit is not all the papers which he had handed to his mother—"there was a brief there." This exhibit consists of three typewritten sheets, legal cap size. The first sheet was of heavier paper, apparently written with a different typewriter and a different colored ribbon than the other sheets. It reads:

"In the supreme court of Kansas. Appeal of a .criminal action. Held in the twenty-fifth judicial district of Kansas, setting in and for the county of Sumner for the regular May, 1933, term of district court. Hon. Wendell Ready, trial judge. Trial date, May 15th, 1933. Case number, Cr. 2120. C. H. Cochran, appellant. John C. Potucek, district attorney for Sumner county, Kansas, and Wendell Ready, district judge of Sumner county, appellees."

On the second sheet the word "petitioner" had been typewritten in three places. In each place that word had been fairly well erased and over it written in ink the word "appellant." Also at the top of the page the words "appellant's brief" were written in ink. Briefly stated, it alleged that Charles H. Cochran is unlawfully sentenced to the state penitentiary at Lansing, Kan., because of irregular procedures of a former commitment, and that the excessive sentence is void because (1) the Oklahoma commitment in 1920 was invalid for want of jurisdiction of the court; (2) that defendant was a minor, mentally incompetent, affected by typhoid fever, and that the mother of defendant entered a plea of guilty for him; (3) that he was denied the right of counsel; (4) that he did not enter a plea of guilty; (5) that judgment was void because of no due process of law; (6) that the Oklahoma court denied his right to a fair trial; (7) that the Sumner county court in 1928 erroneously used the commitment of 1920 against him and doubled his sentence; and (8) that the Sumner county district court assessed an excessive sentence and denied defendant the right to be heard on his prior commitment. The third typewritten sheet is an argument respecting

the points mentioned on the second sheet. Each of these sheets when introduced in evidence had blue pencil marks across them and the word "no" in blue pencil written on the second and also on the third sheet. Petitioner testified these marks were not on the papers when he handed them to his mother, but were on the papers when they were returned to him.

Petitioner presents this incident as a positive showing that Graham, an officer of the prison, confiscated his "appeal papers." We think no such conclusion is to be drawn from it. In reaching that conclusion we pass by matters in the record casting serious doubt on the testimony of petitioner that his mother visited him on that occasion; but for the purpose of our ruling we shall assume as true the incidents of June 9, as testified to by the petitioner, that his mother and others came to see him late in the day; that Father Domain took his mother to Mr. Graham, an officer of the prison; that notwithstanding the late hour Graham took his mother and those with her to the office, had the prisoner brought from the cell house, and permitted him to visit with them in the visiting room; that while they were visiting he handed to his mother an envelope containing papers, and that Graham saw this done and took possession of the papers. There is no intimation in this testimony that Graham knew the contents of the envelope. It is in evidence in this case that all incoming and outgoing mail of every inmate is examined. Certainly to permit an inmate to give some unknown matter to a visitor, or a visitor to give such matter to an inmate, would not be in accord with the rules of the institution. Obviously, serious consequences might result from permitting that to be done. According to the petitioner's testimony these papers were returned to him later. There is no evidence that they, or any duplicates of them, were attempted to be mailed to the supreme court. The prison record of incoming and outgoing mail of the petitioner, in evidence in this case, discloses that he mailed out 162 letters or pieces of mail within the first two years after beginning his prison sentence. Some of these went to the attorney who represented him in the trial, others to the clerk of the district court of Sumner county, one to the county attorney of that county. There were letters to eleven other lawyers located at various places in Kansas, Missouri and Oklahoma, one of whom called to see him at the prison; to the members of the state board of administration, and to various other state and federal officials. The petitioner testified to the blue pen-

cil marks on exhibit No. 1 in such a manner that the inference would be drawn that they were placed there by some prison official. That inference stands on the petitioner's testimony alone, and the freedom with which he condemns many persons, without just cause in at least many cases, causes us to doubt that inference. Obviously, they might have been put on there by the petitioner, or someone else. But, assuming they had been placed there by someone in authority at the prison, and that they indicated the papers were of a character which in the judgment of the prison officials should not be sent to the court, we see nothing seriously wrong with the prison officials conveying that information to the petitioner. Had they reached this court they would not have effected an appeal of his case, and there is no harm in someone telling the petitioner that fact. ·

Petitioner further testified that following the incident of June 9 he prepared another set of "appeal papers" and tried to mail them through the warden's office. These were never returned to him and are not in evidence. He testified that he received through the mail the following:

"7-17-1933—C. H. Cochran, No. 3608. The rules of the institution prohibits your filing any procedure in the courts. Your appeal papers have been turned over to me and I hope you will refrain from your efforts and conform with prison rules hereafter. LACEY M. SIMPSON, *Warden.*"

This was introduced in evidence as petitioner's exhibit No. 2 and is presented and argued as conclusive evidence that the warden prohibited "appeal papers" or "any procedure" in the courts. We decline to give credence to this exhibit. It was all typewritten, including the name "Lacey M. Simpson." It was written on a yellow paper of the kind generally used in many state offices and institutions for the making of notes or memoranda. It is not authenticated in any way. Although there have been filed in this court in connection with this case, or the former case of the petitioner, almost every type of paper which could have any bearing on the matter, this is the first appearance of this document. Lacey M. Simpson was called by the petitioner as a witness at the hearing on July 15. He was not asked by petitioner or his counsel to identify this instrument. Its contents are directly in conflict with his testimony, which will be noted later. It could have been written on the typewriter by anyone, and may have been written by petitioner. · We note it contains the words "appeal papers," frequently used by him throughout the

record in his cases, which of course means nothing definite. (Note its misuse on exhibit No. 1.)

Petitioner further testified that in January, 1934, he again prepared "appeal papers" which he sent to Mr. Simpson, the warden, who sent them to the board of administration, and the pardon and parole attorney returned them. In connection with this testimony there is offered in evidence petitioner's exhibit No. 3. This is a letter written on the regular stationery of the penitentiary, signed by the warden and initialed by his secretary, addressed to the state board of administration at Topeka, which reads:

"I am enclosing herewith a petition C. H. Cochran wishes to have filed in the supreme court."

The date of the letter has across the year a heavy black mark, written with some type of crayon which cannot be erased so as to show the typewritten figures under it. It is January 24, 19—. The top of a "3" appears above the black mark following the "9," but the last figure of the date cannot be made out. The same black material was used in marking below it the figures "1-26-34," and at the bottom of the page is written, "Returned Jan. 27th, 1934." This last notation petitioner testified he wrote. Across the bottom portion of the letter was written, with the same type of black mark, "Parole atty. does not approve," with a heavy line above and below it. We note the warden's letter speaks of enclosing "a petition." Respecting this Mr. Simpson testified as follows:

"Q. Were there any regulations with regard to legal documents being filed by inmates at the time you were warden? . . .

"A. It is my recollection there was no restriction on men drawing up petitions and filing them with the court. In fact, we sent up so many—I know at one time the supreme court—I believe—it is my recollection, felt it was kind of a nuisance because so many were filed without any reasonable ground or foundation. That is digressing a little. Then we took it up with the board, and my recollection is after that submitted—instead of sending them directly to the clerk of the court, sent them to the board of administration, and they took care of the handling of them, but there was no restriction. I remember about a man filing a petition, that is, it was forwarded out through the board when I was here.

"Q. This letter indicates there was a legal document of C. H. Cochran sent to you to have the board of administration's approval on it?

"A. That is in line with what I was saying. In the first they were filing indirectly; they filed with the supreme court. When there were so many filed the board made a rule instead of our sending directly to the clerk of the court, just to send them to the board of administration."

The papers which the petitioner handed the warden and which were sent to the state board of administration are not before us, hence we are unable to say that they dealt with an appeal as distinct from a petition for habeas corpus.

The petitioner further testified that he again prepared appeal papers in June, 1934.

"Q. What did you do with these papers? A. I give them to Mrs. Hinton to mail for me.

"Q. Did you hear what happened to these papers? A. No, sir. I got up to retire from the visiting room and Mrs. Hinton gave me the papers back, telling me Mr. Stubblefield refused to permit her to file them.

"Q. Were these papers returned to you? A. No.

"Q. Those papers you gave to Mrs. Hinton were never returned to you? A. No, they were never returned."

On this point Mrs. Hinton, a social worker who frequently visited the prison, called as a witness on behalf of petitioner, testified to having met and talked with Cochran and was asked and answered these questions:

"Q. Did he ever give you papers to mail to the clerk of the supreme court? A. No, because that—(interrupted) . . .

"Q. Mrs. Hinton, I will ask you to reconsider that question and I will ask you again if he gave you papers to mail out to the clerk of the supreme court? A. No.

"Q. Did he ever actually hand you and [any] of his papers? A. Yes, sir, many times.

"Q. I ask you now, did he ever hand you any and ask you to mail it to the clerk of the supreme court? A. Yes, he did.

"Q. What happened to those papers? A. I could not take them out.

"Q. Tell the court why you could not take them out. [The answer related to time and fixed it before she went on her vacation in 1934.]"

Petitioner further testified that on June 15, 1934, he wrote a letter to his mother, which was returned to him by the deputy warden, E. M. Stubblefield. The letter contained the statement:

"I have sent you several letters enclosing my appeal papers. I realize that you never received them. I have been deprived of my right to appeal my case by force. I know what the reason is . . . These people will not let me send any papers out or file in the court."

This was introduced in evidence as petitioner's exhibit No. 4. It bore a pencil mark thereon, "You must obey the rule of prison. E. M. S." What rule of the prison was not being obeyed is not disclosed. Perhaps the contents of the letter were regarded by the officials as a false assertion respecting the prison authorities. The

record of incoming and outgoing mail for the first two years of his confinement in the penitentiary discloses that the petitioner wrote to his mother thirty-two letters, the first being dated June 9, 1933, and the last February 7, 1935, two of the letters being written in June, 1934; that he received from his mother forty-eight letters, the first being dated July 8, 1933, and the last February 23, 1935. We have previously noted that he was corresponding with his own attorney without any effort being made to have his case appealed; also that he wrote many other attorneys, one of whom had visited him. We do not regard the fact that this letter was turned back to Mr. Cochran by the deputy warden, as being in violation of some rule of the prison, as being any substantial evidence that the prison authorities were denying him a right to appeal his case.

There was an exhibit No. 5, which apparently was not handed to the reporter; at least it is not among the other exhibits. The testimony respecting that discloses that the petitioner had written a letter to the Department of Justice at Washington, that in some way it had become misplaced about the warden's office, and Warden Simpson wrote petitioner that the letter had been misplaced and if he would rewrite the letter it would be forwarded. Exhibit No. 5 was the warden's letter.

Petitioner's exhibit No. 6 purports to be an affidavit signed by his mother October 11, 1934, stating that on June 9, 1933, the prison officials seized from "me, C. H. Cochran's appeal papers, refused to let me file them for him in the supreme court." The evidence disclosed the petitioner's mother is no longer living. Her death occurred in August, 1936. We think the affidavit incompetent as evidence, but assuming it should be considered, it obviously refers to the papers the petitioner handed her on June 9, 1933, as testified to by him and as previously discussed herein.

Lacey M. Simpson, warden of the Kansas state pententiary from June 1, 1933, until February, 1937, called as a witness by the petitioner, in addition to his testimony previously quoted, testified that he had no knowledge of the black pencil marks on exhibit No. 3; that he talked with Mr. Cochran several times about his petitions and about other cases, and was always as helpful as he could be to get their cases presented to the court whenever possible. He did not recall that he had ever seen any of the papers sent back from the board of administration.

"We had a rule, every so often you could write a letter. There was no

period of time as I recall when a man could not see visitors, or write a letter. A new man had the same privilege as an old man. . . .

"Q. During the four years you were warden you testify that these inmates were filling legal documents and permitted to file them?  A. Yes.

"Q. Did you at any time in the four-year period destroy any man's legal documents, whether it was appeal papers?  A. No; no, sir, never did that.

"Q. Did you order your subordinates, employees to destroy any in your four-year period?  A. No; they were always to give the other fellow a chance."

Respondent offered in evidence the deposition of E. M. Stubblefield, now warden of the Illinois state penitentiary and deputy warden of the Kansas state penitentiary from February 20, 1934, to about January 20, 1937. He was reminded of the affidavit of Mrs. Hinton about not being permitted to take papers out of the prison and was asked the policy of the prison officials during his administration.

"A. No one was permitted to take out letters or papers of any sort until after they had been properly censored and permission given.

"Q. I will ask you whether or not during those two years any one was denied the right to appeal.  A. No one was denied the right to appeal and those papers were censored by myself and then submitted to the censor's office for his stamp and to be recorded. . . .

"Q. And to your knowledge during your administration there wasn't any blockade or effort made to restrain inmates from perfecting legitimate appeals to the supreme court of Kansas?  A. Not to my knowledge.

"Q. I would like to have you tell me briefly what was the policy where you had received—the warden's office or your office had received home-made so-called legal documents by inmates. What did you do with those things?  Of course, I realize that you weren't an attorney's office over there. Just what would you do with them after you would get one of those things?  A. Well, the papers would be carefully censored and then submitted to Judge Foulks, parole attorney for the board of administration of Kansas. I might say the purpose of that would be as to their correctness.

"Q. And validity?  A. Yes. And by him then submitted to the proper authorities.

"Q. Well, as a general policy, of course, you didn't approve or disapprove of appeal papers of any nature, did you?  A. No, I did not.

"Q. And to your knowledge the other authorities of the penitentiary did not pass upon the validity of such documents?  A. No."

It was stipulated that the record kept daily at the prison of visitors who called to see inmates of the prison did not show that petitioner's mother visited him at any time within two years after he was received at the prison, and the petitioner stated that she had not visited him at any time except on the evening of June 9, 1933. The

daily record kept at the penitentiary of incoming and outgoing mail of the prison, insofar as it pertained to this petitioner, was admitted in evidence subject to the contention of petitioner that some of his letters addressed to the supreme court of Kansas, the district court of the United States and the district court of Sumner county, were not mailed.

A few matters in the reply brief filed by the petitioner, *pro se* and not previously mentioned, perhaps should be noted. The petitioner states he is filing the brief because he "feels and believes that the counsel appointed for the petitioner has lost interest in the case and that the office of the respondent has coerced the counsel to neglect and fail in his obligation." Mr. C. W. Brenneisen, Jr., was admitted to the bar in June, 1932, and since then has been engaged in the active practice of law. His industry and ability have attracted favorable notice even outside of the county of his residence, so much so that the petitioner asked that Mr. Brenneisen be appointed as his counsel. The request was granted. He corresponded with the petitioner and visited him three times before the date of the hearing, June 15, 1942. His plan of presenting the evidence at the hearing obviously was carefully thought out, and so far as the court could observe the hearing on petitioner's behalf was well managed by his counsel in every particular. Later petitioner, for some reason unknown to the court, or for the lack of any reason, seemed to get the notion his counsel was not doing enough for him, and, as we understand, complained to his counsel about it, also complained to this court. Later he wrote this court apologizing for such complaint and advised the court he was also apologizing to his counsel. We have no objection to the petitioner filing a brief *pro se*, but we see no reason for him to criticize the conduct of his counsel. In the petitioner's brief he complained the court did not issue subpoenas for all the witnesses he wanted. Soon after the order was made for further hearing of this case petitioner filed in this court what was tantamount to a praecipe for thirty-seven witnesses. The list included the clerk of the supreme court of the United States, two federal judges, several state and county officials, and others, many of whom are nonresidents of the state. Not knowing how it would be possible for all these witnesses to have any knowledge of the issues to be heard upon the further hearing of the case the court did decline to issue at once subpoenas for all of them, and advised petitioner of that fact, but did send the list to his attorney, expressing doubt that all of

them would be useful, asked him to check the matter with petitioner, and advised counsel that we would issue subpoenas for any witnesses that were deemed necessary after such a conference. Later the attorney did file praecipes for witnesses, and subpoenas were issued for them, except those who were at the prison, and those were notified to be available. The petitioner says in substance that the hearing on July 15 was conducted behind closed doors and that witnesses who were not testifying and some of his relatives were not permitted to be present. The order excluding the witnesses, other than those testifying, was made at the request of petitioner's attorney in his hearing, and not objected to by him. If he had any relatives there whom he desired to be present at the hearing that fact was not made known to the court. The hearing was conducted in what is commonly known as the hearing room at the state prison, and while it is probable the doors were closed much of the time, all persons who desired to hear the trial, except those specifically excluded, were welcome to be present, so far as the court knows; at least no objection along that line was presented to the court at the time. It is stated in substance that the hearing was unduly cut off before all his witnesses had testified because the official court reporter of the district court, who was acting as stenographer to take the testimony, was needed in the district court. The hearing began about 10 o'clock a. m., continued until about 12:30, adjourned for lunch, and resumed about 1:30. Word was brought to the court soon after lunch time that the stenographer was needed in court at 2:30 o'clock. Before that time was reached, however, word came that his services in court would not be needed, hence there was no closing of the taking of evidence because the reporter was needed in his official duties in the district court. Neither was there any premature closing of the hearing for any other matter that was called to the attention of the court. Counsel were specifically asked if they had anything further to offer, and each of them responded that they had nothing further. Petitioner in his brief *pro se* complains of many other matters concerning which there is no evidence in the record, and at least most of them seem highly improbable. Naturally, we cannot take these matters into account.

Considering the entire record before us, and the briefs, the court specifically finds:

That the prison officials did not frustrate the petitioner's efforts to perfect an appeal to this court:

That despite his conversations and correspondence with his attorney, who represented him at the trial, and with other attorneys, and his freedom to write to the clerk of the district court and the county attorney, he made no effort to take the steps necessary under the law to effect an appeal.

That the words "appeal papers" are freely used by petitioner without any definite legal meaning.

That the official Graham is not to be censured for taking from petitioner's mother the envelope petitioner handed her and returning it to him.

That the prison authorities are not to be censured for having a rule prohibiting an inmate from passing to visitors papers to be taken outside of the prison.

That the attitude of Warden Simpson toward the petitioner was kindly and designed to be helpful, and that he never destroyed any court papers which the petitioner desired sent out, nor authorized any of his subordinate officials to do so.

That the board of administration is not shown by the evidence in this case to have exceeded or abused its authority in any action it took in petitioner's case.

The writ prayed for is denied.